Filed
D.C. Superior Court
01/08/2016 23:05PM
Clerk of the Court

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

**SHELITA STEWART**
2218 1st Street NW #2
Washington, D.C. 20001

        Plaintiff,

    v.

**INSUN HOFGARD**
9385 Juhasz Drive
Great Falls, Virginia 22066

**JEFFERSON HOFGARD**
9385 Juhasz Drive
Great Falls, Virginia 22066

**SEJIN KIM**
10024 Colvin Manor Court
Great Falls, Virginia 22066

**L. KENT FOWLER**
519 C Street, NE
Washington, DC 20002

**JBA DEVELOPMENT LLC**
9385 Juhasz Drive
Great Falls, Virginia 22066

      Serve:  Ben Soto
             Registered Agent
             1534 14th Street, N.W.
             Washington, DC 20005

**SENATE REAL ESTATE SERVICES
LIMITED LIABILITY COMPANY**
909 U Street, NW
Washington, DC 20001

      Serve:  James Williams
             Registered Agent
             909 U Street N.W.
             Washington, DC 20001

Civil Action No. 2016 CA 000196 B

**JURY TRIAL DEMANDED**

**PARAGON TITLE & ESCROW COMPANY**
7415 Arlington Road
Bethesda, MD 20814

    Serve:  Sheryl B. Rothstein
               Registered Agent
               9201 Mistwood Drive
               Potomac, MD 20854

           Defendants.

## VERIFIED COMPLAINT

Plaintiff, by and through counsel, brings this action against Defendants Insun Hofgard, Jefferson Hofgard, Sejin Kim, L. Kent Fowler, JBA Development LLC, Senate Real Estate Services Limited Liability Company, and Paragon Title & Escrow Company for their multiple and continuing violations of the DC Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.* and the DC Condominium Act (the "Condominium Act"), D.C. Code § 42-1901 *et seq.* Plaintiff brings claims for fraud, breach of contract, unjust enrichment, and injunctive relief against the Defendants arising from their unlawful business practices in the District of Columbia.

Plaintiff hereby states, upon information and belief, as follows:

### JURISDICTION

1.    The Court has subject matter jurisdiction over statutory claims in this matter pursuant to D.C. Code § 28-3905(k)(1). The Court has personal jurisdiction over Defendants pursuant to D.C. Code §§ 13-422 and 13-423.

2.    Venue is proper because Plaintiff is a resident of the District of Columbia and this action relates to Defendants' activities within the District of Columbia.

2

## PARTIES

3.     Plaintiff Shelita Stewart ("Plaintiff") is an adult resident of the District of Columbia and the owner of certain real property known as 2218 1st Street, NW, Unit #2, a condominium unit located in the Bloomingdale neighborhood of Washington, D.C.

4.     Defendant Insun Hofgard is a Virginia resident whose home and business address is 9385 Juhasz Drive, Great Falls, Virginia. Jointly with her husband, Jefferson Hofgard, Sejin Kim, and through corporations that they own and control, Insun Hofgard engages in the business of purchasing residential properties in D.C., renovating them, and converting them to condominiums and selling them to consumers.

5.     Defendant Jefferson Hofgard is a Virginia resident whose home and business address is 9385 Juhasz Drive, Great Falls, Virginia. Jointly with his wife, Insun Hofgard, Sejin Kim, and through corporations that they own and control, Jefferson Hofgard engages in the business of purchasing residential properties in D.C., renovating them, and converting them to condominiums and selling them to consumers. Upon information and belief, "JHOFGARD@AOL.COM" is an email addressed belonging to Jefferson Hofgard which is used for conducting and facilitating the business of Insun Hofgard, Jefferson Hofgard, Sejin Kim, JBA, and other business entities used in their condominium conversion scheme as described further herein.

6.     Sejin Kim ("Kim") is a Virginia resident whose home address is 10024 Colvin Manor Court Great Falls, Virginia 22066. Upon information and belief, Kim is a joint owner with Insun Hofgard of 2218 1st Street LLC, the declarant of the 2218 1st Street Condominium and partner in JBA Development LLC.

3

7.     JBA Development LLC ("JBA") is a company domiciled and operating in D.C. Upon information and belief, JBA Development LLC is the alter ego of Defendants Insun Hofgard, Jefferson Hofgard, and Kim.

8.     Senate Real Estate Services Limited Liability Company ("Senate") is real estate brokerage business (Lic. No. LL98372321) organized in D.C. and trading as "Senate Realty" whose principal business address is 909 U Street, NW, Washington, D.C. At all times relevant herein, Senate has acted as the seller's agent for Defendants Insun Hofgard, Jefferson Hofgard, Kim, and JBA in the marketing and sale of new condominiums projects by these Defendants.

9.     L. Kent Fowler ("Fowler") is a D.C. resident who is licensed as a real estate salesperson by the D.C. Real Estate Board (License No. 98362500) and is formerly employed by Senate. While working under the real estate brokerage license of Senate, Fowler served as the sales agent for numerous D.C. properties that were acquired, developed, and converted into condominiums and sold for profit by Defendants Insun Hofgard, Jefferson Hofgard, Kim, and JBA.

10.     Paragon Title & Escrow Company ("Paragon") is a company organized in Maryland whose principal place of business is 7415 Arlington Road, Bethesda, MD 20814. Paragon specializes in conducting real estate settlements in the Washington, D.C. metropolitan area. Paragon conducted the real estate settlement for 2218 1st St. NW, Unit # 2, which Plaintiff purchased from the JBA Defendants.

## LEGAL FRAMEWORK

<u>The District of Columbia Consumer Protection Procedures Act</u>

11.     The District of Columbia Consumer Protection Procedures Act ("CPPA") provides that:

> A person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia . . . .

D.C. Code Ann. § 28-3905(k)(1).

12.     It is a violation of District of Columbia law, and therefore an unlawful trade practice under the CPPA, id., whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:

(a)     represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

(b)     represent that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have;

(c)     represent that goods are original or new if in fact they are deteriorated, altered, reconditioned, reclaimed, or second hand, or have been used;

(d)     represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e)     misrepresent as to a material fact which has a tendency to mislead;

(f)     fail to state a material fact if such failure tends to mislead;

\*     \*     \*

5

(h)     advertise or offer goods or services without the intent to
        sell them or without the intent to sell them as advertised
        or offered;

                    *       *       *

(p)     falsely state or represent that repairs, alterations,
        modifications, or servicing have been made and
        receiving remuneration therefor when they have not
        been made;

                    *       *       *

(u)     represent that the subject of a transaction has been
        supplied in accordance with a previous representation
        when it has not;

*Id.* § 28-3904 (emphasis added).

13.     Additionally, "the CPPA's extensive enforcement mechanisms apply

not only to the unlawful trade practices proscribed by § 28-3904, but to all other statutory

and common law prohibitions." *Osbourne v. Capital City Mortgage Corp.*, 727 A.2d 322,

325-26 (D.C. 1999).

14.     The CPPA allows for treble damages, or $1,500 per violation,

whichever is greater, as well as reasonable attorney's fees, an injunction against the unlawful

trade practice, "additional relief as may be necessary to restore to the consumer money or

property . . . which may have been acquired by means of the unlawful trade practice," and

"any other relief the court deems proper." D.C. Code Ann. § 28-3905(k)(1).

The District of Columbia Condominium Act

15.     The process of converting an existing property into a condominium is

governed by the Condominium Act, which provides that:

> Any lack of compliance with [the Condominium Act] or with any lawful provision of the condominium instruments shall be grounds for an action or suit to recover damages or injunctive relief, or for any other available remedy maintainable by [ ] an aggrieved person.

D.C. Code Ann. § 42-1902.09.

16.     With respect to construction or renovation work done in connection with a conversion condominium, the Condominium Act requires that "[a] declarant shall warrant against structural defects in each of the units for 2 years from the date each unit is first conveyed to a bona fide purchaser, and all of the common elements for 2 years." *Id.* § 42-1903.16 (b).

17.     With respect to sales of a conversion condominium, the Condominium Act states that:

> [A] declarant may not dispose of any interest in a condominium unit not previously disposed of unless there is delivered to the purchaser a current public offering statement by the time of the disposition.

*Id.* § 42-1904.02 (b).

18.     D.C. Code § 42-1904.04 prescribes the requirements of a public offering statement and states, in pertinent part, as follows:

> (a)     A public offering statement shall disclose fully and accurately the characteristics of the condominium and the units therein offered and shall make known to prospective purchasers all unusual and material circumstances or features affecting the condominium. The proposed public offering statement submitted to the Mayor shall be in a form prescribed by his rules and shall include:

>                    *        *        *

(5)     A copy of the condominium instruments, with a
        brief narrative statement describing each and
        including:

           *      *      *

(A)     Information on declarant control;

(B)     A projected budget for at least the first year of the
        condominium's operation (including projected common
        expense assessments for each unit);

           *      *      *

(D)     A statement of the amount, or a statement that there is
        no amount, included in the projected budget as a
        reserve for repairs and replacement;

           *      *      *

(8)     A general statement of:

(A)     The status of construction;

(B)     The project's compliance with zoning,
        site plan and building permit regulations;

           *      *      *

(D)     The projected date of completion of
        construction or renovation of the major
        amenities of the condominium;

(c)     The declarant shall file with the Mayor a statement of
        any material change in the information contained in the
        public offering statement. Such statement shall be filed
        within 15 days after the date on which the declarant
        knows or should have known about the change.

The term "condominium instruments" includes the new condominium's declaration, bylaws,

and plats and plans and any exhibit, schedule, or certification accompanying such documents.

*See id.* § 42-1901.02 (5)

      19.     "A condominium declarant is liable under the Condominium Act "for

any false or misleading statement in a public offering statement or for any omission of a

material fact with respect to the portion of the public offering statement that he or she prepared or caused to be prepared." *Id.* § 42-1904.02 (d)

## FACTS GIVNG RISE TO PLAINTFF'S CLAIMS FOR RELIEF

The JBA Defendants' Condominium Conversion Scheme

20.     Defendants Insun Hofgard, Jefferson Hofgard, Kim and JBA (collectively the "JBA Defendants") are engaged together in a scheme of purchasing residential properties in D.C., converting them into substandard condominiums, and selling them personally and through the numerous business entities that they own and control. The JBA Defendants' scheme employs deceit, misrepresentation, omission, and shortcutting in the condominium conversion, renovation, and sales processes. These unlawful tactics allow JBA Defendants to unfairly and illegally ensure that their projects sell quickly and for the most profit possible. The JBA Defendants carry out this scheme using a regular and familiar list of contractors, professional service providers, and real estate sales agents who are willing to look past the JBA Defendants' unfair and deceptive practices, creating what essentially amounts to "pay-to-play" relationships with the JBA Defendants.

21.     Through their condominium conversion scheme, the JBA Defendants have realized millions of dollars of profit. While the shortcuts and regulatory avoidance strategies that they employ often expose them to regulatory fines, remediation costs, and buyer complaints, the JBA Defendants assume these risks in pursuit of profits of the magnitude they realize when they successfully sell out of a new condominium conversion project. The JBA Defendants have apparently decided that the profits are worth the risk and appear to have perpetrated this scheme no less than *ten* times in a just a few years.

22.     To initiate a scheme, the JBA Defendants identify and buy often-blighted row houses in up-and-coming areas of the city. Shortly after buying the properties, the JBA Defendants submit condominium conversion documentation to DCRA's Rental Conversion and Sale Division to convert these row houses into the condominium form of ownership.

23.     The condominium conversion documentation submitted by the JBA Defendants contain misrepresentations that are designed to unlawfully increase the likelihood that D.C. approves the conversion application and to fraudulently make the properties more attractive to prospective buyers, many of whom are first-time home buyers or buying their first property in D.C.

24.     By way of example, in the "public offering statements," a primary document relied upon by potential buyers and D.C. in the conversion process, the JBA Defendants falsely swear that certain aspects of major systems and fixtures that comprise "common elements" of the converted condominiums are "new" when they are, in fact, highly worn, deteriorated, and near the end of their useful life.

25.     The effect of these misrepresentations are twofold: (1) they give D.C. false assurances that substantial, appropriate investments into the infrastructure of the properties have been made; and (2) they give potential purchasers who rely on the condominium instruments false comfort that they are pursuing a high quality, new construction property and that the replacement of expensive systems and fixtures will not be needed for many years.

26.     Another example of how the JBA Defendants unlawfully use the condominium instruments to perpetuate their scheme is the purposeful, gross understatement

of the condominium fees and reserves that their developments will require on a monthly basis from the unit owners, which appears at Section V-C of the public offering statements.

27.     The JBA Defendants know that the amount of condominium fees is a significant factor in the desirability and marketability of a condominium unit. In D.C., potential buyers are often attracted by low condominium fees. The amount of condominium fees for a particular unit is also a significant factor in a lender's determination of a borrower's ability to afford a condominium unit. Developers that are able to market and advertise comparatively low condominium fees, all other things equal, are generally more successful in selling their units.

28.     For the JBA Defendants, misrepresenting that the common elements of their condominium developments are "new" and will have a longer useful life causes the represented amount of the monthly reserves to be falsely lower than they would be had the JBA Defendants made truthful disclosures.

29.     This unfair practice damages purchasers of condominium units developed by the JBA Defendants. It conceals the true amount needed for reserves for the upkeep and replacement of the systems. The systems fail long before expected useful life represented by the JBA Defendants and creates unanticipated expense. Unit owners then find that their condominium associations are not adequately-reserved and end bearing the brunt of costly repairs to major systems and other damage that their failure may cause.

JBA Defendant's Substandard Renovations

30.     The JBA Defendants renovate, remodel, repair, and make structural changes to their condominium conversion properties. The construction work on these redeveloped properties is often done in a reckless and unapproved manner – or not done at all. These properties are then marketed to consumers as fully renovated condominiums.

11

These renovations typically include, or purport to include, new roofs, gourmet kitchens, and stairs; replacement of electrical systems, plumbing systems, and HVAC systems; replacement of floors and walls; and other major home renovations and repairs.

31.     The condominiums units developed and sold by the JBA Defendants often include highly-desirable and trendy features such as open floor plans, rooftop balconies, off-street parking, remote-controlled fireplaces, and ceiling fans.  These amenities are offered to attract discerning buyers and highlight features generally associated with high-quality condominium projects and to conceal the markedly low-quality infrastructure and workmanship underlying JBA projects.

32.     Upon information and belief, the JBA Defendants have implemented their illegal condo conversion and sales scheme for the following projects:

—     2218 1st Street Condominium

—     2128 1st Street Condominium

—     40 Adams Street Condominium

—     2825 11th Street Condominium

—     1130 Columbia Condominium

—     1713 New Jersey Avenue Condominium

—     1818 1st Street Condominium

—     26 Q Street Condominium

—     33 Bryant Street Condominium

—     34 Channing Street Condominium

—     35 Q Street Condominium

—     430 Warner Street Condominium

12

The 2218 1st Street Condominium Conversion

33.     In November 2011, the JBA Defendants bought the row house at 2218 1st Street, NW, Washington, D.C. (*i.e.*, Lot/Square No. 0016/3122) for the purpose of converting it into a condominium and selling it for profit.

34.     Around February 28, 2012 and pursuant to the Condominium Act, the JBA Defendants caused an application package to be submitted to seeking D.C.'s approval to convert the 2218 1st Street property to a condominium. Insun Hofgard, as "Managing Member" of 2218 1st Street LLC, executed and submitted an affidavit with the application attesting that the "statements [ ] contained in the documents submitted [w]ere true and correct." Included in the application package for the 2218 1st Street Condominium was a copy of the condominium plats and plans, declaration, bylaws, estimate of initial condominium fees and capital contribution, form purchase agreement, deed, and estimate of settlement charges.

35.     As required by the Condominium Act, the 2218 1st Street Condominium public offering statement recited the declarant's warranty against structural defects "for two years from the date that [the condominium units] are completed or from the date that the first unit is conveyed, whichever is later."

36.     The 2218 1st Street Condominium public offering statement included in the submission to DCRA also stated, among other things, that

>     —     "Each unit is individual (*sic*) metered and billed for gas and electric;" and

>     —     "The estimated hard costs of construction, excluding soft costs and labor, will be approximately $250,000."

37.     The 2218 1st Street Condominium public offering statement also

contained an estimate of operating expenses for the first year of operation of the

condominium, including "the establishment of a reasonable reserve fund for capital

improvements, replacements and major repairs." The list of operating expenses included a

line item for "Total Annual Reserves" and showed that the annual reserves needed for the

condominium was $1,996.20. This amount was calculated based on "estimates of

replacement costs and years of useful life" of the common elements. With respect to these

common elements, the 2218 1st Street Condominium public offering statement stated that

"[a]ll components are new." The components referred to included, among others,

condominium's plumbing, domestic water system, roof, gutters and downspouts, windows,

and exterior doors.

The JBA Defendants' Shoddy Renovation of 2218 1st Street Condominium

38.     Nearly immediately after the JBA Defendants purchased the property,

renovation was commenced to turn the three-story, plus-basement property into two

condominium units.

39.     The JBA Defendants skimped on construction work, used substandard

materials, and made renovations and repairs that were of substandard quality. Additionally

the renovations and modifications to the condominium were not performed to the relevant

construction codes and are often not performed by qualified and/or properly-credentialed

contractors. The JBA Defendants failed to obtain proper permits for renovations, resulting in

construction of property features and the installation of fixtures that were not approved and

permitted in accordance with the District's Construction Codes and other applicable

regulations. And, contrary to the sworn representations in the public offering statement,

many of the components of the common elements, including the condominium's plumbing, roof, gutters and downspouts, and exterior doors were not "new."

     40.    None of these facts were disclosed.

The JBA Defendants' Marketing and Sale of 2218 1st Street Condominium

     41.    In March 2012, Plaintiff attended an open house in the Bloomingdale neighborhood at 2128 1st Street NW. Plaintiff was not accompanied by a real estate agent nor was she represented by one. She was in the market to buy, and had seen marketing materials publicizing this property, a two-unit condominium conversion, which was being offered for sale by the JBA Defendants. Each unit was priced approximately in the $500-$550,000 range. The open house was being hosted by Fowler, a license D.C. real estate agent, who was then employed by Senate Realty

     42.    Plaintiff liked the style and feel of the 2128 1st Street Condominium. The property showed well and had what appeared to be many high-end fixtures, including three bedrooms and three bathrooms, private off-street parking, gas fireplaces and hardwood floors, large open floor plans, private decks, deck views of the Capitol and Washington Monument, sun filled rooms, and offered many neighborhood amenities.

     43.    Plaintiff and Fowler discussed the property. In thier discussion, Fowler indicated that the same developers were working on many projects around town. Fowler inquired with Plaintiff regarding her desire to find a property and offered to assist in that process. Fowler aggressively pursued Plaintiff and offered to help her find a property.

     44.    Fowler assisted Plaintiff in finding a property to purchase. On several occasions, Fowler brought Plaintiff to the offices of Senate Realty for meetings, the purpose of which was to pull and provide sales listings for Plaintiff's consideration.

45.     Plaintiff directed Fowler in her housing search. She told him what neighborhoods she wanted to look at and he furnished listings. Fowler and Plaintiff drove around to the various houses and listings that he provided to Plaintiff that fit the parameters of her search. Plaintiff routinely sent Fowler leads on properties for sale and requested that he follow up with the sellers. Fowler used his credentials as a real estate agent to obtain access to the properties, including interfacing with selling agents and brokers to obtain lockbox codes.

46.     Fowler acted as Plaintiff's agent, and Fowler and Plaintiff had agreed that once a suitable property was found, he would represent her for the transaction.

47.     As part of his agency for Plaintiff, Fowler counseled Plaintiff through the financial qualification phase so that once Plaintiff found a property, she would be poised to pull the trigger on a purchase in what everyone understood to be a very competitive D.C. real estate market. Indeed, Fowler counseled Plaintiff to qualify for as much as she can up to her "maximum" in case Senate was able to find something for her. Fowler put Plaintiff in touch with a lender who prequalified Plaintiff and computed Plaintiff's maximum. Plaintiff provided this information to Fowler.

48.     Fowler told Plaintiff that he was the exclusive agent for the developer of 2128 1st Street Condominium and that, because she liked that property, he could direct her to similar properties. Fowler further indicated that as the developer's agent, he had inside information regarding the availability of such properties and when they would come online and be available for purchase. The more Fowler touted the JBA Defendants' body of work, the more Plaintiff became interested in their condominium conversion projects. Over a period of four months, Fowler showed Plaintiff scores of properties, some of which were owned by the JBA Defendants and other that were not.

16

Plaintiff Chooses 2218 1st Street Condominium

49.     In June 2012, Fowler sent Plaintiff a handful of listings that included a listing for 2218 1st Street, NW Unit # 2 (herein Unit 2). Among the listings sent, Plaintiff initially indicated that unit was her "third choice."

50.     Fowler counseled Plaintiff through the process and nurtured her interest in Unit 2. Around this time, Fowler also advised Plaintiff that Unit 1, the downstairs unit at the 2218 1st Street Condominium (herein "Unit 1") was already under reservation with another buyer and that he did not expect Unit 2 to be available for very much longer. Fowler statements led Plaintiff to believe that she needed to decide quickly and then act swiftly, if there was a possibility that she wanted to purchase Unit 2.

51.     Plaintiff advised Fowler that she wanted to reserve and make an offer on Unit 2. Around June 18, 2012, Plaintiff signed a nonbinding reservation agreement to purchase Unit 2. In connection with this process, Fowler purported to furnish Plaintiff a copy of the public offering statement and the necessary condominium instruments and disclosures. Several of the exhibits to the public offering statement, including the plats and plans, were not included in the paperwork given to Plaintiff by Fowler.

52.     Now that Unit 2 was under reservation by Plaintiff and Unit 1 was already under reservation with another buyer, the JBA Defendants aggressively pushed to get the property to closing. In doing this, the JBA Defendants would need to have the condominium conversion confirmed by DCRA and would need to complete the renovation.

53.     Over the next several months, the JBA Defendants and their construction crews, contractors, service providers, agents, and employees scrambled to complete the property. In this scramble, numerous construction shortcuts were made that would eventually contribute to structural and other problems at the property. Substandard

materials were used. Proper permits were not obtained. Unlicensed contractors did the work. Defendants concealed their unpermitted and substandard work by failing to have full and final inspections performed as required by District law. Defendants failed to obtain the appropriate permits for the actual work performed. Defendants used third party inspectors who rubberstamped the JBA Defendants' work.

54.     To ensure that Plaintiff did not discover the substandard methods, materials and shortcuts that were being taken in the final stages of construction, Fowler set up a process on behalf of JBA Defendants where Plaintiff would not be allowed visit the property at any time during the final stages of construction without advance notice to the JBA Defendants. This process gave the JBA Defendants an opportunity to "clean up" prior to any inspection by Plaintiff in which she might get wind of the JBA defendant's deficient construction methods. It was an important part of the scheme to conceal from Plaintiff the nature and amount of shortcuts that were taken and the truly-shoddy nature of the work done.

55.     Fowler's obstruction and JBA's schemes notwithstanding, Plaintiff was able to see some degree of JBA Defendants' failings in the construction of that the property. In the time leading up to her closing, Plaintiff noticed, pointed out, and asked Fowler to address numerous deficiencies at the property.  Her requests included, among others, the following:

> — remediation of water intrusion in multiple locations in roof;
>
> — pouring concrete and marking for parking spaces;
>
> — installation of electrical wiring;
>
> — gas meter installation;
>
> — installation of safety fencing around balcony in master suite;
>
> — pointing up of exterior brick and replacement of crumbling mortar

in multiple exterior locations; and

— repairs to the gutters, downspouts, and flashing .

56.     In each and every instance, the JBA Defendants themselves or, through agents, employees and contractors assured and represented to Plaintiff that the deficiencies would be corrected. In the vast majority of the cases, the deficiencies were never corrected. These assurances and representations were false, and designed to ensure that Plaintiff went to closing on the property.

57.     On or around December 31, 2012, shortly before Plaintiff's transaction was scheduled to close, the closing for Unit 1 occurred.

Plaintiff's Closing with Paragon Title

58.     After repeated delays, closing on the Unit 2 was ultimately scheduled for January 8, 2013 at Paragon Title & Escrow Company's Bethesda office. The choice to use Paragon was made by the Defendants. Paragon's Vice President, Robert Gratz, Esq. conducted the closing.

59.     At closing, Plaintiff was presented with, among other documents, a copy of a purported plat for the property which showed two parking spaces in the rear of the dwelling, one of which appeared to encroach upon the walkway leading to Unit 1. This was the first time Plaintiff was given an opportunity to view the plat, which should have been provided at the very latest with the Public Offering Statement in the weeks leading up to closing.

60.     Prior to closing, Plaintiff had been told by Defendants that there would only be one parking space to the north of the walkway, and it would be for Plaintiff's use exclusively. Understandably concerned by this new conflicting information, Plaintiff stopped the settlement and sought clarification from Mr. Gratz regarding this inconsistency. Plaintiff

advised Mr. Gratz that the plat showed conditions that were, in fact, contrary to the property as it actually existed, as Plaintiff had seen only one space marked when inspecting the property.

61.     Indeed there were numerous other conditions of the closing process that had not been met: the roof was leaking, appliances were not installed; there was no hot water; the electrical metering system had not been installed. This list is not exhaustive, but rather exemplary of the items in plain view that were not completed at the time of closing.

*by whom?*

62.     At closing, repeated assurances were given to Plaintiff that two parking spaces could be carved out of the land behind the building, notwithstanding the lack of prior disclosure. *By whom?*

63.     Rather than confirm that the property conformed to the representations made in the condominium instruments, appraisal, FHA materials, and Bank of America loan documents prior to closing, Paragon allowed Plaintiff to proceed.

64.     Paragon was to be paid out of proceeds from Bank of America's funding of the loan for Plaintiff. In addition to the settlement and closing fees, which Paragon would earn, it underwrote title insurance to Plaintiff, also to be paid for through the transaction. Paragon's financial self-interest drove the transaction, and therefore Mr. Gratz counseled Plaintiff to close the deal, notwithstanding the deficiencies in the property. *by whom?*

65.     At closing, it was determined that the JBA Defendant would be allowed to complete the still-outstanding work, repairs and renovations to the property after closing. Plaintiff relied reliance on the representations made at closing and, further, believed that the JBA Defendants were obligated under the sales contract and the condominium instruments to make good on their promises. As it turns out, the work was never completed.

66.     To purchase Unit 2, Plaintiff paid a total of $686,053.24, including buyer settlement charges and taxes. Of this amount, $650,195.00 was paid to the JBA Defendants. After reductions for seller settlement charges, taxes, and payoff of mortgage to EagleBank, JBA Defendants collected $275,934.93. As a result of this transaction, Senate Realty collected $16,542.50 in commissions.

Construction Deficiencies at the 2218 1st Street Condominium Are Revealed

67.     Following Plaintiff's closing, she immediately begin to learn of the problems caused by the JBA defendant's defective condominium conversion process and renovation of the 2218 1st Street Condominium. The problems at the condominium were major structural item.

68.     Plaintiff learned about the following deficiencies, among others, in Unit 2 and the Property's common elements:

a.  *Roof.* The roof that JBA Defendants had represented in the condominium instruments and on other occasions as "new" was highly deteriorated. This was discovered through a series of massive leaks into Unit 2. As a result of these leaks, even now, Unit 2 is constantly taking in water. This issue has caused extensive damage in Unit 2 and is an ongoing source of concern, damage and stress for Plaintiff.

b.  *Defective Tile.* Within a week of closing, the tile work in the bathroom in Unit 2 began cracking, chipping, and separating from the substrate.

c.  *Sewage backups.* Despite the fact that the condominium instruments purport that the plumbing system in the property is new, the 2218 1st Street Condominium unit owners experienced substantial sewage backups, which were characteristic of old cast iron sewage pipes rather than properly-sized, new materials.

d.  *Insulation.* Plaintiff suspects that inadequate insulation exists in the exterior walls of Unit 2 given the temperature regulation problems and "hot" and "cold" zones that have presented themselves in Unit 2.

e.  *Inadequate Floor and Ceiling Joists.* The 2218 1st Street Condominium Unit Owners learned that the JBA Defendants, in their efforts to create the much-desired and highly marketable open floor

plan at the condominium, used undersized floor and ceiling joists and ran such joists across spans with inadequate support. Plaintiff's floor (which is connected to the ceiling in Unit 1, below) sagged so badly that, to prevent a collapse, the JBA Defendant had to temporarily relocate the downstairs unit owners to a hotel while the ceiling was ripped out, and the beams and joists shored up and/or replaced. Whatever purported corrective measures were taken by the Defendants were inadequate; the floors still sag, swell, and exhibit excessive "bounce."

f. *Defective Water Heating.* Upon and after her closing, Plaintiff had no hot water in Unit 2 and the water heater continues to operate in a defective manner.

g. *Defective Heating and Cooling Systems.* Shortly after closing, Plaintiff had no heat in Unit 2. The system was not functioning. Plaintiff later learned from the JBA Defendants that part of the heating problem was the fact that the drywall contractors "sheetrocked" over the top of heating vents and closed them into the ceiling.

h. *Water Intrusion and Inadequate Runoff.* Plaintiff discovered problems caused by water intrusion, leaks, improper drainage, and the shortcuts taken in regards to the framing of the property, that have accelerated deterioration at damage the property. At times, the surface water runoff is so extensive that it floods the landing at the bottom of the steps leading to the entry door of Unit 1.

i. *Defective Rooftop Deck.* Plaintiff recently learned that the rooftop deck of Unit 2, which has been an ongoing source of structural and water intrusion problems was built by the JBA Defendants in a substandard matter and was never permitted. The JBA defendants have failed to identify or correct the true source of water entry caused by this fixture.

None of these deficiencies were properly corrected by the JBA Defendants and Plaintiff's damages, as a result, are ongoing.

69. These latent defects were not known to Plaintiff at the time she reserved and contracted to purchase Unit 2, which was still under construction at that time. When such defects were brought to the JBA Defendants' attention after closing, they assured Plaintiff that the items would be repaired. However, the JBA Defendants failed to make the repairs properly or failed to make the repairs at all.

22

*Day before closi* [handwritten annotation]

70.     By way of example, in an email dated January 7, 2013 and preceding email chain forwarded to Plaintiff, the JBA Defendants represented to Plaintiff and her agent that a leak in the back bedroom was "rectified." The leak was not properly repaired.

71.     In another email dated March 19, 2014 the JBA Defendants represented to the Plaintiff that their agent would repair her roof "this week," and after completed, another agent would address the "rest of the issue [sic] in the interior of your home." The roof was not repaired and many issues remain in the interior of Unit 2.

72.     Then, in an email dated April 22, 2013, the JBA Defendants represented to Plaintiff that all of the remaining items at the property in need of repair on the Plaintiff's "punch list" would be completed. Most of the items on this list have never been properly addressed.

73.     Several months after closing, upon noticing that that her electricity bill was exceptionally high, Plaintiff approached the JBA Defendants who revealed for the first time that the electricity was not separately metered, as promised, and represented in the condominium instruments. As it turned out, the JBA Defendants had failed to secure the proper permitting, inspections, and approvals from DCRA and/or PEPCO to have separate meters installed. It was not until several months after closing that Plaintiff, through her own efforts, was able to file the necessary paperwork to bring the electrical metering system into compliance.

74.     From shortly after Plaintiff's closing until summer 2015, the JBA Defendants purported to make attempts to cure the deficiencies brought to their attention by the 2218 1st Street Condominium unit owners. The JBA Defendants enlisted, among others, the following contractors, agents, and employees, all of whom provided assurances and representations to Plaintiff that the deficiencies would be addressed:

— Insun Hofgard

— Kim

— Fowler

— Antonio Santander

— ASA Roofing, Inc.

— Nuri Vitiello

— Shammi Roshantha

— Ramon Izquierdo

— Henry Akinnouye;

75.     JBA Defendants have since abandoned all efforts to cure the numerous

deficiencies that remained at the 2218 1st Street Condominium.

## COUNT I

### Direct Violations of the D.C. Consumer Protection Procedures Act

### All Defendants

76.     Plaintiff hereby incorporates by reference all the preceding paragraphs

as if fully set forth herein.

77.     It is a violation of District of Columbia law, and therefore an unlawful

trade practice under the CPPA, id., whether or not any consumer is in fact misled, deceived

or damaged thereby, for any person to:

(a)     represent that goods or services have a source,
sponsorship, approval, certification, accessories,
characteristics, ingredients, uses, benefits, or quantities
that they do not have;

(b)     represent that the person has a sponsorship, approval,
status, affiliation, certification, or connection that the
person does not have;

24

(c)     represent that goods are original or new if in fact they are deteriorated, altered, reconditioned, reclaimed, or second hand, or have been used;

(d)     represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e)     misrepresent as to a material fact which has a tendency to mislead;

(f)     fail to state a material fact if such failure tends to mislead;

*     *     *

(p)     falsely state or represent that repairs, alterations, modifications, or servicing have been made and receiving remuneration therefor when they have not been made;

*     *     *

(u)     represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not;

*Id.* § 28-3904 (emphasis added).

78.     The Defendants committed violations of the CPPA through misrepresentations and omissions to Plaintiff in the course of the conversion and sale of the 2218 1st Street Condominium regarding:

— the nature and manner of renovation work done at the property;

— the quality and nature of the materials used;

— the age of the common elements;

— allowing the transaction to proceed without material conditions having first been met;

&mdash; promising to correct construction deficiencies at the property and never doing so;

&mdash; understating the amount of reserves needed to keep and maintain the common elements; and failing to make full disclosures in the sales process.

79.  The representations, misrepresentations, and omissions of material facts were made with knowledge that they were false or that the omission would create a false understanding.

80.  Plaintiff justifiably relied on these representations, misrepresentations, and/or omissions of material facts.

81.  Defendants' actions constitute unfair and deceptive practices within the meaning of the CPPA.  As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages.

82.  Defendants' violations of the CPPA were intentional, willful and wanton and justify the imposition of treble and punitive damages.

## COUNT II

### Violations of the D.C. Consumer Protection Procedures Act
### Through Violations of The Condominium Act

### Against The JBA Defendants

83.  Plaintiff herby incorporates by reference all the preceding paragraphs as if fully set forth herein.

84.  "The CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 28-3904, but to all other statutory and common law prohibitions."

26

85.     The process of converting an existing property into a condominium is governed by the Condominium Act, which provides that:

> Any lack of compliance with [the Condominium Act] or with any lawful provision of the condominium instruments shall be grounds for an action or suit to recover damages or injunctive relief, or for any other available remedy maintainable by [ ] an aggrieved person.

D.C. Code Ann. § 42-1902.09.

86.     The JBA Defendants have violated the CPPA through their breaches of the Condominium Act in, among others, the following ways:

— disposing of Unit 2 without having provided a complete and accurate public offering statement for the property;

— by providing Plaintiff condominium instruments that contained representations that the JBA Defendants knew were false and misleading;

— failing to fully and accurately disclosed the characteristics and deficiencies of Unit 2 and the 2218 1st Street Condominium;

— intentionally understating and falsifying the necessary monthly reserves of the 2218 1st Street Condominium's

## COUNT III

### Fraud

**Against The JBA Defendants and Fowler, and Vicariously Against Senate**

87.     Plaintiff herby incorporates by reference all the preceding paragraphs as if fully set forth herein.

27

88.     The JBA Defendants and Fowler made numerous false statements as further described, *supra*, in the course of Plaintiff's transaction for Unit 2.

89.     They represented such statements as fact when they knew that they were false;

90.     These representations were made in communications conducted in person, over the telephone, via text message, and in email. Numerous communications containing misrepresentation and fraudulent statements were made by Jefferson Hofgard and/or through e-mail accounts belonging to him.

91.     The misrepresentations of fact were material.

92.     Defendants made these misrepresentations with the intent to deceive Plaintiff, knowing that they were false and intentionally for the purpose of inducing Plaintiff to purchase Unit 2 and to facilitate their condominium conversion sales scheme.

93.     Plaintiff reasonably relied on these representations in proceeding with the transaction to purchase Unit 2.

94.     Plaintiff has been damaged as a direct and proximate cause of the actions of these Defendants, including.

95.     Fowler's misrepresentations are imputed to Senate by virtue of the master-servant relationship. Moreover, Senate has received substantial remuneration in connection with the Plaintiff's purchase of Unit 2 and at Plaintiff's expense.

96.     The JBA Defendants, Fowler, and Senate engaged in the foregoing conduct as part of a scheme of deception to market and sell condominium conversion projects of the JBA Defendants. Defendants have similarly defrauded other condominium unit purchasers in the District of Columbia.

28

97.     Defendants' conduct was egregious and committed in willful or wanton disregard of the rights of the Plaintiff, warranting the imposition of punitive damages.

## COUNT IV

### Breach of Contract

### Against the JBA Defendants

98.     Plaintiff herby incorporates by reference all the preceding paragraphs as if fully set forth herein.

99.     A valid contract existed between Plaintiff and the JBA Defendants through which the JBA Defendants agreed to warrant certain amenities and fixtures of Unit 2 including the warranty against structural defects undertaken by the JBA Defendants in the course of the condominium conversion process.

100.     The JBA Defendants had an obligation to Plaintiff, arising out of the contract which they breached.

101.     The JBA Defendants failed to honor the warranty clause and, upon information and belief, never had any intentions to honor it.

102.     Plaintiff has been damaged as a direct and proximate cause of the actions and omissions of the JBA Defendants, including that she is left with a property that was constructed and renovated in a substandard manner, is out of compliance with applicable Construction Codes, and presents an ongoing danger to Plaintiff's health, safety, and personal property. Plaintiff has been damaged as a result of the JBA Defendants breaches' and her damages are ongoing.

## COUNT V

### Unjust Enrichment

**Against All Defendants**

103.    Plaintiff herby incorporates by reference all the preceding paragraphs as if fully set forth herein.

104.    The JBA Defendants were unjustly enriched, receiving a legally cognizable benefit from Plaintiff in the form of a substantial profit for the sale of Unit 2 though they failed to deliver the property, as promised, and as represented in the condominium instruments.

105.    Defendants Fowler and Senate were unjustly enriched, receiving a legally cognizable benefit in the form of substantial commissions on the sale of real estate that they knew did not conform to the standards of quality represented by the JBA Defendants and as promised to Plaintiff.

106.    Defendant Paragon was unjustly enriched, receiving a legally cognizable benefit in the form of settlement fees and commissions earned on the placement of title insurance arising from Plaintiff's transaction, even though Paragon was aware of numerous conditions of closing, including conditions related to the unfinished state of the property that had not and could not be met.

107.    Defendants possess an appreciation and knowledge of these benefits.

108.    Defendants acquired these benefit through their fraud, misrepresentations, omissions and, as such, accepted and retained them under inequitable circumstances.

## COUNT VI

### Injunctive Relief

### Against the JBA Defendants

109.    Plaintiff herby incorporates by reference all the preceding paragraphs as if fully set forth herein.

110.    Upon information and belief, the JBA Defendants have, over the past several years, repeatedly perpetrated the scheme described herein and fraudulently sold condominium units in the District of Columbia that were not constructed in accordance with acceptable standards, often illegally, and which were not accurately represented in the condominium instruments.

111.    Upon information and belief, there are at least twenty such similar transactions between the JBA Defendants and District of Columbia condominium buyers.

112.    Upon information and belief, the JBA Defendants have properties in the pipeline that appear to be developed and sold in furtherance of their scheme.

113.    Because Defendants' actions involve the homes of their victims, which in many cases are their most valuable assets, there is no adequate remedy at law.

114.    Plaintiff asks the Court to enter a permanent injunction enjoining any of the Defendants:

A.      from engaging in the unconscionable and fraudulent activities described herein;

B.      from filing any application to convert or offering for sale any condominium in the District of Columbia that does not conform as represented in the condominium instruments relating to such property; and

31

C.     to amend all Condominium Instruments they have filed that do not

represent the actual conditions and characteristics of such property.

WHEREFORE, Plaintiff prays:

A.     That the Court grant the relief requested in Counts I through VI herein;

B.     That the Court award Plaintiff actual, compensatory, and punitive damages in

an amount $3,700,000.00 or such other amount that may be established at

trial;

C.     That the Court grant a permanent injunction enjoining Defendants:

—     from engaging in the unconscionable and fraudulent activities

described herein;

—     from filing any application to convert or offering for sale any

condominium in the District of Columbia that does not conform as

represented in the condominium instruments relating to such property;

and

—     to amend all Condominium Instruments they have filed that do not

represent the actual conditions and characteristics of such property.,

D.     That the Court award Plaintiff attorneys' fees and costs;

E.     That the Court grant any such other further relief as the Court deems just and

proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims for which there is a right

to a jury trial.

Respectfully submitted,

THE METCALF LAW FIRM

Dated: January 8, 2016

By: _____
Phillip Metcalf (DC #482545)
The Metcalf Law Firm
1300 I Street, N.W., STE 400E
Washington, D.C. 20005
Tel.: (202) 739-8334
Fax: (888) 871-7230

*Attorney for Plaintiff*

## VERIFICATION

I hereby declare that the factual statements in this Verified Complaint are true and correct to the best of my knowledge.

Shelita Stewart

January 8, 2016